## DAVIDSON v. DALLAS.

Where the agent, on behalf of his principal, performs an unauthorized act—yet if the principal has put the agent in a position to mislead innocent parties, he is responsible to them.

And a subsequent general power from the principal to the agent, to sue for all sums due the principal, and to execute all instruments necessary to carry the power into full effect, will, as to innocent third parties, bind the principal for obligations incurred in the collection of a loan, which was unauthorized as between the principal and agent.

An indemnity bond to the sheriff to retain property seized under attachment, is an instrument necessary to carry the power to sue into effect.

A ratification of the unauthorized acts of an agent, can only operate after full knowledge of those acts.

Where property was seized under two attachments, and the property was claimed by a third party, whereupon both attaching-creditors indemnified the sheriff, who went on and sold it, and paid the proceeds to the first attaching creditor, the amount not equaling his judgment—and afterwards, the party claiming the property, obtained judgment against the sheriff for the value of the property : Held, that the recourse must be had against the first attaching-creditor, for whose benefit the property was sold.

In such case, the attaching-creditors do not stand in the position of joint trespassers, the seizure of the second being subject to the first.

The sheriff was the separate agent of both attaching-creditors, but in the order stated, and as he disposed of the property to the benefit of the first alone, he must look to him, and not the second attaching-creditor.

A judgment-record is only conclusive between the parties and their privies, except in some cases for specific purposes.

When a judgment-record is used in evidence, it can only be considered as conclusive evidence, where its operation is mutual, and concludes both parties.

Where property attached is claimed by a third person, the sheriff may protect himself before a jury of six persons, and if the verdict be in favor of the claimant, he may relinquish the levy, unless indemnified. If he gives the bond of indemnity, it will only enure to the benefit of the owner of the property, so far as the consequences which result from his own acts are concerned.

When the sheriff attaches property of the defendant, he does it as the officer of the law. If it is not the property of the defendant, he is the agent of the attaching creditor.

APPEAL from the District Court of the Twelfth Judicial District, County of San Francisco.

B. Davidson, the plaintiff in the Court below, as the assignee of W. R. Gorham, sheriff of San Francisco, brought this action against A. G. Dallas, E. R. Falkner, and Bernard Peyton, on a bond for one hundred thousand dollars, given by them to W. R. Gorham, under the following circumstances :

1. One Gilson sued out an attachment against Meiggs, for thirty-five thousand dollars, and had the steam-tug "Underwriter" seized by Gorham, sheriff of the county of San Francisco, on the eighth day of December, 1854, at thirty minutes past twelve o'clock, A. M.

2. One McPherson, claiming to act as the agent of defendant Dallas, also sued out an attachment against Meiggs for twelve thousand five hundred and forty-two dollars, which was also

levied on the "Underwriter," on the same day, at two o'clock A. M., being *after* the levy of the other attachment.

3. Davidson, the plaintiff claimed the "Underwriter" as his property; whereupon bonds of indemnity were required by the sheriff from both Gilson and Dallas.

4. A separate bond was accordingly given by Gilson, with sureties, and also a separate bond executed by McPherson, as agent of Dallas, with sureties; each bond indemnifying the sheriff for detaining the property under the respective attachments.

5. On the twelfth of December, 1854, Davidson sued Gorham for the seizure of the vessel, and on the sixteenth of January, 1855, recovered judgment against him for the sum of eighty-five thousand dollars.

6. McPherson and Gilson both had notice of the trial of Davidson *v.* Gorham, and both assisted to defend it.

7. The sheriff has not paid the judgment of Davidson against him, but assigned to Davidson the bond of indemnity, executed by McPherson as the agent of Dallas.

8. Davidson brought this suit upon this bond, and recovered judgment in the Court below, against Dallas and his sureties, for the full penalty of the bond, namely, one hundred thousand dollars, and they appealed.

9. Before the case of Davidson *v.* Gorham was finally disposed of, and while the same was pending in this Court, on appeal, McPherson (claiming to act for Dallas) and Gilson entered into an agreement, by which it was stipulated "that in case the decision of the Supreme Court shall be given in our favor, and that the vessel shall not produce sufficient to satisfy both demands, with costs of suit, we will divide the net amount received *pro rata*, in proportion to the several amounts due us, and pay all necessary expenses occurring, in the same proportion, with the exception of the fees charged by our respective solicitors, which we agree to pay individually; and in case the said suit shall be decided adverse to us, we agree to pay the necessary expenses in the same proportion, except the fees of our solicitors."

10. Dallas, who resided in Scotland, sent to McPherson the sum of twenty thousand dollars, to purchase a prior mortgage upon certain land, on which Dallas held subsequent mortgages. At this time, McPherson had no formal power of attorney from Dallas.

11. McPherson, finding he could not, at the time, purchase in the prior mortgage, took the responsibility of lending the money, in part, to Meiggs, taking the two notes to Meiggs, the one payable to "A. W. McPherson, agent for A. G. Dallas, or order," and the other to A. W. McPherson, agent, or order." These

Davidson v. Dallas.

notes he endorsed to Dallas, before commencing the suit of Dallas v. Meiggs.

12. McPherson afterwards received from Dallas a regular power of attorney, authorizing him "to enter into and to take possession of all lands, tenements, and real and personal estate, whatever, in said State of California, or elsewhere within the United States of America; and to uplift, recover, sue for, and discharge, all sum or sums of money, due and addebted to me, within the said States; with power to my said attorney to arbitrate, compromise, and amicably settle, all questions in which I may be in any way, or to any extent, interested within the United States, and to enter into, subscribe, and deliver, in due form of law, all deeds requisite for these purposes, or any of them; with power also to sell and dispose of said real and personal estate, or any part or parcel thereof, or interest therein, and to grant all necessary deeds and acquittances, to carry these powers into full effect; as also, generally to manage my affairs in said States." This power of attorney was executed in Scotland, August 24, 1854, and received by McPherson, October 25, 1854. The first note of Meiggs was for four thousand eight hundred and ninety-two dollars, dated September 18, 1854; and the second for seven thousand six hundred and fifty dollars, and was dated October 3, 1854.

13. Gilson obtained judgment against Meiggs, upon which execution was issued, September 29, 1855, for thirty-eight thousand five hundred and seventeen dollars and twelve cents, under which the vessel was sold, October 8, 1855, for thirty-five thousand dollars, and the proceeds paid to Gilson.

14. On the second January, 1856, Gorham, for the consideration of two thousand five hundred dollars, paid by Gilson, released the sureties of Gilson from all liability upon the indemnity bond given by Gilson.

15. The bonds given to the sheriff by Gilson and McPherson, were each for the sum of one hundred thousand dollars.

On the trial, among other things, there were introduced in evidence by the plaintiff, the judgment-records, and proceedings thereunder, in the case of Dallas v. Meiggs, and Davidson v. Gorham, under the exception of defendant's counsel.

A. W. McPherson was examined as a witness by the defence, and testified as follows:

"Falkner and Peyton, the sureties, executed the indemnity bond at my request. I first asked them the day it was executed. The bond was signed at the sheriff's office in the presence of the clerk who drew it out. The clerk was a Mr. Brady, who, I think was deputy-sheriff. Mr. Falkner, when I asked him at his office to sign, asked me if Mr. Dallas was to be responsible for it. I told him that Mr. Dallas was to be responsible. I then assured him that Mr. Dallas would protect him. He knew I

16

represented Mr. Dallas. I told him I had a power of attorney in the sheriff's office. Mr. Falkner said if the case went against us he would be ruined. I then assured him that Mr. Dallas would protect him. I signed the bond first. I did not show the power of attorney. Falkner asked me frequently whether it was Dallas' bond. He refused to sign my bond. The bond, when executed, was delivered to Mr. Brady. Mr. Dallas had then, and has now, a large property in this State. I directed the suit of Dallas *v.* Meiggs, to be brought. Dallas remitted me twenty thousand dollars for investment in August, 1854. I received it in August, 1854. A portion of this I invested in Meiggs' warrants, (forged warrants,) about thirteen thousand dollars. I brought the suit of Dallas *v.* Meiggs to recover the money. It was in this suit that the indemnity bond was given. The investment in warrants must have been in September or October, 1854. It was under the power of attorney in evidence that I executed the bond. I received the money before I received the power of attorney. The warrant investments were all made by the first of October. The money was sent me for a different purpose. It was sent to purchase the Saucelito Rancho mortgage of Barton Ricketson, and upon which Mr. Dallas had other mortgages subsequent to that of Ricketson. I tried to buy it and could not, and in the mean time I invested the money in short loans, and I had invested some of the money in the warrants before I received the power. First investment before I received the power, the other after. So far as these short loans to Meiggs are concerned, they were made without authority from Dallas. I considered this as Dallas' debt when the suit was brought. I had invested other money for Dallas before this. Mr. Dallas has mortgages upon the Saucelito Rancho, a house in Sacramento street, and money in the hands of Falkner, Bell & Co., who for six months have been acting as his agents. The mortgages belonging to Dallas in the Saucelito Rancho amounts to thirty thousand or forty thousand dollars. He has also a mill on the Albion Rancho.

"I think Mr. Falkner did not see the power of attorney when I received it. He alluded to the suit of Davidson *v.* Gorham. I knew of that suit when I signed the bond, and I wrote to Mr. Dallas about the proceedings in regard to the "Tug Underwriter." I did not draw upon him for the expenses, nor upon Jardine, Matheson & Co. I did not pay the keeper's fees out of any of Dallas' money.

The Ricketson mortgage was a prior one to Dallas', and the purchase of it was intended to protect his mortgages. I wrote to Mr. Dallas about the Underwriter suit, some time after the attachment. Don't recollect whether it was before or after the bond."

The plaintiff had judgment in the Court below for the full

amount of the bond, one hundred thousand dollars. Defendants moved for a new trial, which being denied, they appealed.

*Saunders & Hepburn* for Appellants.

That in the Meiggs loan, McPherson acted without authority from Dallas, who has never ratified it; and that therefore said debt from Meiggs was never, in fact, owing to Dallas, and said suit was therefore not authorized under the power.

When Mr. Dallas remitted the twenty thousand dollars, it was, in the strictest sense, the creation of a special agency. There were no antecedent relations between McPherson and Dallas, from which an authority could be inferred. The loan to Meiggs was utterly unauthorized, and at the risk of McPherson, who is now responsible to his principal for the amounts invested and lost, not as a guarantor, but in money had and received.

There can be no doubt of this. There is no evidence of ratification by Mr. Dallas, nor even of notice, except by the mailing of a letter, which he is not proved to have received, nor its contents proved in the cause.

There is no evidence of notice to Dallas of the execution of the bond, even by mailing a letter of advice.

If it be contended that Dallas clothed McPherson, by the remittance, with ostensible ownership of the money, so far as to protect third persons in their dealings with the agent, the answer is:

The very causes of action in Dallas *v.* Meiggs, showed the agency of McPherson; and the acceptance of the Meiggs note, by Dallas, to have been, if at all, by procuration; putting all persons dealing with McPherson, in respect of them, distinctly upon inquiry as to the fact of acceptance, and as to the fact and extent of his authority.

Both these notes (in Dallas *v.* Meiggs) were originally made to McPherson, and endorsed by him to Dallas, upon the eve of the suit.

If an agent, to whom money is remitted for a prescribed investment, may not only appropriate it to his own use, or divert and lose the fund, but involve his principal in prospective engagements, (although actually unauthorized,) because he is in the possession of the money, then there must be an end of all monetary enterprise, beyond the immediate supervision and control of a capitalist. A factor, being in possession of goods, may sell on credit, and the purchaser insist upon a set-off against the factor. But a factor, as such, cannot sell the goods, receive the money, and invest in a manner to involve further and unauthorized responsibility of his principal. So, an agent entrusted with commercial paper, negotiable by delivery, may, so far as third persons are concerned, misapply it against his instructions.

The case at bar is distinguishable from all such cases, in this:

that in the others, the property itself being placed in the possession of an agent, with all the *indicia* of ownership, it would be a fraud upon third persons to insist upon less power, by private instructions, than he gave by his acts, which alone are observable and known to the buiness world. The property is therefore answerable, and only the property. In this case, not only is the money remitted lost, but another liability incurred, although the sheriff (the party treating) was distinctly informed of the fiduciary capacity of McPherson, in receiving the notes; and the notes in his hands actually unendorsed by Dallas. See Story on Agency, §§ 443, 444, for instances of the former class of cases.

The bond is unauthorized by the power. The agency it created is special, for it enumerates specifically the contemplated acts of the attorney, and the general clauses afterwards occurring in the power, do not enlarge its operation, but only express what an attorney would, in any event, have by necessary implication of law. The special powers are:

1. To sue for, recover, and receive money and property, owing or belonging to the principal at the execution of the power, and to arbitrate, compromise, and amicably settle for the same, and to enter into, etc., all deeds, etc., that may be requisite for these purposes.

2. To sell property, and execute all necessary deeds, etc., to carry the foregoing powers into effect.

3. To manage the principal's affairs, and do any other act in the premises, etc.

The general clause in this power is expressly confined to the special purposes previously defined.

If it were not, it could, upon a well-settled rule of construction, have no more extended operation. See Billings v. Mann, S. C. Cal., Jan. Term, 1857; Rossiter v. Rossiter, 8 Wend., 494.

In the construction of a formal power, the bond, to be valid, must be within the express terms of the power, or necessarily implied as incident to an express power, and indispensible to its effectual and ordinary exercise. Paley on Agency, marginal page, 192; Story on Agency, §§ 76, 77.

In the case at bar, it will not be contended that the act in question is authorized by the concluding general clause, "to manage," etc., but that the power to execute deeds, will or may include a bond given in the course of, and to promote the purposes of, a suit properly instituted, or the collection of a debt under the power.

Now, it is evident that the power to execute deeds, in the connection in which it appears in this instrument, imports no substantive power of itself. It is indicated as a means of executing certain special powers just before enumerated, which are, "to sue," etc., and to "compromise," etc., and must, of course, be

Davidson v. Dallas.

confined to the execution of those powers, not regarding them as a mere motive or suggestion to its exercise, upon any occasion, and in any manner, at the discretion of the agent, but naturally flowing from the specified act, as a usual and natural means of accomplishing it.

It is not the intent of the agent, however *bona fide*, that will validate the act, but the special intent of the principal, discernible upon the face of the power, and by a strict construction. See Hubbard v. Elmer, 7 Wend., 448.

It is submitted, that the bond being authorized by the power, and Mr. Dallas not bound, his sureties are released :

1. Because the instrument purports to be the undertaking of Dallas as principal, and Falkner & Peyton as sureties; and within the principle of Bryan v. Berry, Cal., Oct T., 1856, ought to be construed as the principal undertaking of Dallas, and that of the sureties as accessory.

In which case they are not bound for want of a principal engagement. 1 Pothier on Obligations, page 176. Which is identical with the English law, when the character of principal and secondary obligations is once established.

2. The undertaking is incomplete, and shows the intention of the sureties to be bound with Dallas, and not without him. See Wood, Judge et al. v. Washburn, 2 Pick., 24; Bean v. Parker, 17 Mass., 604.

The principle is the same where the defect is by incapacity of the principal, and, of course, where the execution is unauthorized. See Burge on Suretyship, 6, 7, and notes.

3. The sureties are affirmatively proved to have excuted expressly with the view of the responsibility of Dallas to them. McPherson represented himself as fully authorized, and Falkner indicates his reliance upon the responsibility of the principal, at the time of the execution and delivery of the bond, in the most positive manner. His being an ostensible principal in the bond and the sureties' evident reliance upon him, brings the case clearly within the principle of the most exacting cases. See Leafetal v. Gibbs, 19 Eng. Common Law Rep., 604; Parker v. Bradley, 2 Hill, 586, and cases cited.

There is no breach of the conditions of the bond, and no damage proved. The condition is to indemnify the sheriff for detaining the property levied on :

1. The proof (record of Gilson v. Meiggs) shows the original seizure to have been in another cause. The record of Davidson v. Gorham (the judgment in which is attempted to be used here as affording a measure of damages, and to show that liability has been incurred by the sheriff, within the recital and conditions of our bond,) shows only that the damage recovered was attributable, not to any act of the sheriff, in Dallas v. Meiggs, but to his conduct in Gilson v. Meiggs. See answer in Davidson

*v.* Gorham, in which defendant justifies by process in the Gilson case alone.

2. The sheriff voluntarily abandoned our process and lien, and converted the property, under final process, in Gilson . *v.* Meiggs.

Under our attachment, as long as the stipulated detention continued, the property was responsive to the undertakers in the case. The sheriff, upon receipt of execution in Gilson's case, might have re-delivered the property to Davidson, or required indemnity upon sale. His indefinite engagement to detain the property in the Dallas case was then performed. He had detained her until other and inconsistent process issued, commanding him not to detain her. He chose to sell her, which occasioned the contended loss, which, until his sale, was represented by the property itself, and a sure indemnity against damage or liability by the intention. The sheriff now seeks to make a guaranty against loss by our detention, an indemnity against the loss of the vessel, under a foreign process, which he was not bound to obey, and ought not to have obeyed, without an indemnity against loss or liability by that act. The end of this detention, under our process, was when he was obliged, by receipt of an execution, to deliver up the vessel to Davidson, or sell her under the execution.

The sheriff was bound to see to the application of all other sureties of the principal. Here he has literally, for a consideration, actually sold the lien of the principal. And it will not strengthen his case, that he did so without the assent of the principal—in actual fraud of his rights, as well as his sureties. See Story on Contracts, § 872.

*S. Heydenfeldt* for Appellant.

It was urged, however, by the respondent, in the argument at the bar, that the suit in the name of Dallas was a ratification, because, as it was said, it was a record, and imported verity, it could not be disputed, and was conclusive. This argument evinced so great an error of the governing legal principle, as to make it appear almost a waste of time to answer it. Records are only conclusive between parties and privies, and must be mutual. Greenleaf says : " But to prevent this rule from working injustice, it is held essential, that its operation be mutual. Both the litigants must be alike concluded, or the proceedings cannot be set up as conclusive upon either." 1 Green. Ev., § 524.

In this case, Gorham was no party to the suit of Dallas *v.* Meiggs, and as he is not concluded by it, so cannot be Dallas.

What then is the effect of the record in that suit ? I give the answer by another quotation from the same author : " A record may also be admitted in evidence in favor of a stranger against one of the parties, as containing a solemn admission or judicial

declaration by such party in regard to a certain fact. But in that case, it is admitted, not as a judgment conclusively establishing the fact, but as the deliberate declaration, or admission, of the party himself that the fact was so. It is therefore to be treated according to the principles governing admissions, to which class of evidence it properly belongs." Green. Ev., § 527.

The rule, as thus laid down by Greenleaf, applied to this case, makes the record in Dallas *v.* Meiggs, merely an admission of the former that he authorized the suit, but, like all admissions, leaves it liable to be rebutted by showing the truth.

3. The rules of law require greater strictness in the interpretation of powers of attorney, than any other instruments, and nothing can be taken by implication unless it is so clear as to exclude every other conclusion.

To imply, therefore, that in the power from Dallas to McPherson, is contained authority to execute a bond of indemnity, is carrying construction to its extremest latitude. It is not, in any respect, a necessary incident to the power to sue, for the suit may be commenced, carried on, and concluded, without its exercise; and this is all the right which the power to sue confers.

That a contract of indemnity may be eventually beneficial to the party suing, is no argument in favor of the existence of the power to make it. McPherson might have refused to enter into it, and still the suit would have progressed to a final termination, and thus exhibited a complete, unbroken, efficient exercise of the power to sue. But as this point is satisfactorily treated in the argument of Sanders and Hepburn, I decline its further examination.

4. It is insisted, that no damage was sustained by the sheriff in consequence of the levy under the Dallas attachment. The rule of the law, in regard to the proper measure of damages, confines them to the actual loss, and if there be no loss, then the damages are nominal. Judge Story, speaking of the doctrine, says, that "it is a good defence, or rather a good excuse, that the misconduct of the agent has been followed by no loss or damage whatsoever to the principal; for then the rule applies, that although it is a wrong, yet it is without damage; and to maintain an action, both must concur, for *damnum absque injuria,* and *injuria absque damno,* are, in general equally objections to any recovery." Story on Agency, § 236.

"Every one," says Lord Holt, "shall recover damages in proportion to the prejudice he hath sustained." Ferrer *v.* Beale, 1 Ld. Raym., 692. In Walker *v.* Smith, 1 Wash. C. C. R., Judge Washington says : "The rule is, that the plaintiff should recover so much as will repair the injury sustained by the misconduct of the defendant."

Sedgwick says, "That if loss without legal injury goes unredressed, the correlative proposition is equally true, that injury

without loss furnishes no ground for other than nominal relief"—
and in a note, he cites a case from 11 Mees. & Wels., wherein
Rolfe, B., says, " though injury may have resulted to the plaintiff,
it is *damnum absque injuria*, and no action will lie." Sedg. Mea-
sure of Damages, 31.

And again : " Substantial loss to the party must have ensued
to entitle him to substantial relief." Ibid., 32.

In this case, before the levy of the Dallas attachment, the proper-
ty was already seized; afterwards sold under the prior attachment.
It is apparent, that the Dallas attachment caused none of the
injury.   This is answered by the assertion, that it is not known
that the sheriff would have held the property but for the Dallas
bond of indemnity.   To this we have two answers; first, a bond
of indemnity was already given in the first suit, which was re-
ceived as satisfactory by the sheriff, and therefore, he was bound
to hold the property.   Second, we have the sheriff's solemn ad-
mission of record, in his answer to the complaint of Davidson,
that he seized and detained the vessel by virtue of the Gilson
attachment.   He calls upon us now for damages.   We ask, what
are they ?   He points to the recovery against him in the case of
Davidson *v.* Gorham ; he wishes to conclude us by that suit; but
if so, then the rule must work both ways:  Examine the case,
and not one dollar has been recovered of the sheriff on account
of any act of Dallas; the legality of the Dallas levy was not put
in issue; the material issue found and determined, was the im-
proper seizure and conversion in the Gilson case; that is all
which that record establishes, and it is therefore no evidence to
prove loss sustained by the levy for Dallas.

Greenleaf says: " The principle upon which judgments are
held conclusive upon the parties, requires that the rule should
apply only to that which was directly in issue, and not to every-
thing which was incidentally brought into controversy during
the trial." 1 Greenl. Ev., § 528.

There was but one trespass, because the sheriff was the agent
of both attaching-creditors, and performing but one act—that of
seizing—affecting one and the same piece of property incapable
of subdivision—detaining the property for the same period of
time ; by his act, he unites all parties by whose directions, or
in whose favor he makes the levy, in one trespass, as effectually
as if they were all present, and assisting in the manucaption.
Nor can it be urged, that a levy made, or rather entered, at two
different times, alters this position.   For if that be true, then, as
there was but one taking, the second levy is no trespass.   But
the second levy is only made a trespass by relation to the first
taking.   See Wyntle *v.* Chetwind, 1 Dow., N. C., 204 ; Chambers
*v.* Coleman, 9 Dow., P. C. 388.

Now it will hardly be disputed that one satisfaction is all that
can be had for one trespass.   See Livingston *v.* Bishop, 2 Johns.,

290; Thomas *v.* Rumsey, 6 Johns., 26; Campbell *v.* Phelps, 1 Pick., 62; Baker *v.* Lovett, 8 Mass., 79; Sanderson *v.* Caldwell, 2 Aiken R., 200, Vermont.

In Campbell *v.* Phelps, above cited, Wilder, J., says: "If two take the goods of another, or convert them to their own use, and judgment is recovered against one, and afterwards the other pays the value with or without suit, the property will vest in them jointly, or in him who pays the price."

In Baker *v.* Lovett, above cited, C. J. Parsons says:—"Where one trespass has been committed by several persons jointly, the party injured may sue any or all the trespassers, but he can recover but one satisfaction for the same injury. As it is confessed by the pleadings, that the trespass was committed jointly by Dennis and the defendant, and that Dennis has made full satisfaction, the plea in bar is sufficient," etc.

*C. Temple Emmet, and Robinson, Beatty & Botts,* for Respondent.

The appellant's counsel are in error when they assert that we concede McPherson's want of authority to make the loan to Meiggs.

The record discloses the facts:

1. That the money could not be used in the special purpose for which it is alleged to have been sent by Dallas. And,

2. That McPherson had previously been in the habit of making short loans with Dallas' money.

From these two facts, it may legitimately be deduced that McPherson was authorized to make the loan in question. At least these facts were proper evidence towards establishing the fact of such authority; and, uncontradicted, are sufficient to support a finding that such authority existed. This Court will not disturb the finding of the Court below on a question of fact, except where such finding is a gross departure from the evidence.

We do not, therefore, concede that McPherson was not originally authorized to make this loan.

But we might safely make the concession, since any original want of authority is undoubtedly cured by the record of the suit of Dallas *v.* Meiggs.

No principle can be better settled than that in relation to the effect to be given to judicial records. For all the purposes for which they can be used, they are absolutely conclusive of the facts which they assert. Nothing can be alleged against their truth. The only mode of avoiding their effect is to show that the record is inapplicable to the purpose for which it is attempted to be used, and hence not admissible in evidence.

So absolute is this rule, that it has been uniformly held that the party to a judicial record will not be permitted to avoid or contradict it, even where he can show that his name has been

used without the slightest pretence of authority from him. He may recover damages against the attorneys, and other parties who have, without authorization, bound him by the record. But he cannot destroy the effect of the record itself. Field *v.* Gibbs, Peters' C. C. Rep., 155 ; 7 Pick., 138 ; The People *v.* Bradt, 7 Johns., 539.

But Dallas had authorized McPherson to bring this suit. The power of attorney was received before the suit was commenced. Although the powers granted by that instrument are limited in number, they are general in their character. That is to say, the power to sue, for instance, is not confined to suing for a particular and specified debt. It is to sue for all and any moneys due the principal. Hence, the power of attorney is what is termed a general power. Now, the money loaned to Meiggs was undoubtedly the money of Dallas. The notes given in evidence of the loan were, in terms, to " McPherson, agent for Dallas, and McPherson, agent.'' Dallas could have recovered against Meiggs directly, on at least one of the notes, without any endorsement by McPherson ; and perhaps on both. Meiggs certainly could not have defeated the action by pleading a want of authority in McPherson to make the loan. Such a plea would have been demurrable.

How absurd it is to say that Dallas could recover money from Meiggs, yet Meiggs was not indebted to Dallas.

And even if the notes had been in the name of McPherson individually, without the addition of agent, after McPherson had endorsed them to Dallas, and suit was brought in the name of the latter, could Meiggs have plead, in the terms of the appellant's argument, that McPherson had no authority, originally, to loan the money to him ; no authority to endorse the notes to Dallas ; that Dallas had never ratified the act ; and hence that Dallas could not recover in that action ? Would not such a plea on Meiggs' part have been demurrable ?'

And, finally, upon this point, the bond, upon which this suit is brought, recites the fact that Meiggs was indebted to Dallas.

The attorney is appointed " to uplift, recover, sue for and discharge all sum or sums of money, due and addebted to me by any person or persons, company, corporation, or firm, within the said States ; with power to my said attorney to arbitrate, compromise, or amicably settle all questions in which I may be in anywise, or to any extent, interested, within the said United States ; and to enter into, subscribe, and deliver, in due form of law, all deeds requisite for these purposes, or any of them,'' etc.

To what purposes is this special power to enter into deeds intended to apply ? Clearly to the precedent matter of the instrument. And to what portion of the precedent matter ? We submit that it must be held to apply to each and every distinct power or purpose preceding it. It cannot be confined to the last

purpose mentioned, "to amicably settle." That, we shall show, is itself made auxiliary to the power to uplift and recover. But assuming for the moment, that it is an independent and principal power or purpose, we say that the expression "for these purposes or any of them," cannot be confined in its application to the power "to amicably settle," for the words are used in the plural number. Then, if it cannot be confined to the last purpose mentioned, upon what principle can its application be limited to a portion of the precedent purposes? This would be making a merely arbitrary separation of the foregoing matter, for which there is no warrant in the terms or intent of the instrument itself. The word "any" means every, and the expression "for these purposes or any of them," in effect reads: "for the foregoing purposes and every of them." It will not be pretended that to uplift or to recover, etc., debts, is not one of the purposes of the power of attorney.

But a syntactical analysis of the sentence will show that the powers to uplift, recover, sue for, and discharge debts, are the principal purposes of the first branch of the instrument, and that the powers to arbitrate, compromise, and amicably settle, as well as the power to enter into deeds, are made auxiliary to those principal purposes.

The attorney is appointed to uplift, recover, etc., all sums of money, etc., then, after a semicolon, follow the words: "with power to arbitrate, etc.," the preposition "with," showing the connection and dependence of the second on the first member of the sentence. And then, after another semicolon, "and to enter into all deeds, etc." The conjunction "and," showing a continuation of the connection and dependence of the last upon the first member of the sentence.

To this point, we cite the case of Trenchard v. Hoskins, Winch's Rep., 91, cited in Gainsford v. Griffith, 1 Saund. Rep., 60, where the grantor covenanted that "he was seized in fee, that he had good power to sell, and that no reversion was in the crown, notwithstanding any act done by the covenanter." It was held that the words "notwithstanding any act done, etc.," referred to the two preceding covenants, and not simply the last. For "the restrictive words coming at the end of the last sentence, may be indifferently applied to both the precedent sentences," and "were omitted at the end of the two first sentences, to avoid tautology and idle repetition; they, at the end of the last sentence, being well applicable to all the former sentences."

So, in the case of Thellusson v. Woodford, 11 Vesey Ch. Rep., 112, where the testator, in declaring the duration of certain trusts, provides that they shall last "during the natural lives of my sons P. J. T., G. W. T., and C. T. 2d. And of my grandson J. T., son of my said son P. J. T. 3d. And of such other sons as my said son P. J. T., now has or may have. 4th. And of such

issue as my grandson J. T., son of my said son P. J. T., may have. 5th. And of such issue as any other sons of my said son P. J. T., may have. 6th. And of such sons as my said sons G. W. T. and C. T. may have. 7th. And of such issue as such sons may have, as shall be living at the time of my decease, or born in due time afterwards."

It was argued that the words " or born in due time afterwards," could only relate to the seventh class immediately preceding them, and could not be held to refer to all the preceding classes. And it was well urged in support of this view, that the first and second classes and part of the third, treated of lives then in being, in respect to which the words "born in due time afterwards," could with no propriety relate. But it was nevertheless held by all the Judges of England and in the House of Lords, that the words referred to all the preceding classes, although it was admitted that such a construction tended to create a perpetuity, and was manifestly against the policy of the law.

And in the same case, reported in 4th Vesey Ch. Rep., 227, the Court say, " the adding the restriction after the enumeration of the last class, was not because it was intended to apply to that only, but in order to avoid the frequent repetition of it." And again : " I deny the rule that it is to be applied only to the last antecedent connected by the word 'and.' It is not even so in criminal cases."

So, in the case of The King v. Wilkes, 4 Burr, 2527, where the sentence was " At the house known by the sign of the Three Suns, in Brook street, near Holborn, in the county of Middlesex." It was contended that the words "in the county of Middlesex," related to Holborn only, and not to Brook street. But Lord Mansfield held that they related to Brook street as well as to Holborn.

It is asked if the liability which Gorham had incurred, resulted from anything he had done for Dallas.

The appellants contend that inasmuch as there was a prior attachment to that of Dallas,' the detention of the vessel from the true owner, could not have been for Dallas' benefit.

But we submit, in the first place, that the test of the defendant's liability on this bond, is not whether detaining the vessel should result to the benefit of Dallas. The expectation of such benefit may have induced Dallas to give the bond. But the question here is, what induced the sheriff to detain the vessel from Davidson ? For that is the act for which he has incurred the liability. Clearly, the sheriff's inducement to this act was Dallas' request and the receipt of Dallas' bond. He detained the vessel because Dallas promised by his bond to protect him against liability for so doing. Dallas' promise was not that he and his sureties would protect the sheriff from such consequences, provided the detention should enure to Dallas' benefit. Had he

Davidson v. Dallas.

proposed such a contract, the sheriff would have answered that he could not insure such a result—that the ultimate disposition of the vessel depended upon circumstances entirely beyond his (the sheriff's) control. That he had no power to decide who should have the vessel. This question it was the province of the Court to determine. That there was only one thing he could do, which was to keep the vessel from Davidson, and he would undertake to do that if Dallas would protect him against the consequence of doing so; but he could not undertake for anything beyond merely keeping the vessel from Davidson. And that he (Dallas) must judge before he gave the bond, whether detaining the vessel from Davidson would result to his (Dallas') benefit.

Was not this necessarily the contract between Dallas and the sheriff, even without reference to the terms of the instrument? Can it be other than this? Does not the law so define its meaning?

And Dallas did consider whether detaining the vessel from Davidson would enure to his benefit. He knew that if the vessel was delivered to Davidson there was an end of all chance to recover his debt from Meiggs.

We say that the acts of retention and sale were done at the request of Dallas, and for the benefit he expected to derive from them. That these acts of seizure, retention, and sale, are the acts of the sheriff at the instance, and as the agent, of all the attaching-creditors, is not only the doctrine of all the authorities, but is expressly admitted at p. 8, of the last brief of appellant's counsel. Judge Heydenfeldt says: "The sheriff was the agent of both attaching-creditors, performing but one act, that of seizin, detaining the property for the same period of time; by his act he unites all parties by whose direction, or in whose favor he makes the levy, in one trespass as effectually as if they were all present and assisting in the manucaption."

It has been argued, though, that the record of Davidson against Gorham, shows an admission of Gorham, that he took and retained the vessel under the attachment of Gilson, and not that of Dallas. This is not quite ingenuous in Mr. Dallas, when we remember that he framed Gorham's answer in which this pretended admission is found. That he, Dallas, was the real and Gorham only the nominal party to that suit, and that the statement is, therefore, not the admission of Gorham, but the allegation of Dallas himself.

But over and above all this, the question is one of law, and, as Judge Heydenfeldt shows, when Dallas' counsel, in drawing Gorham's answer, stated that Gorham retained the vessel under Gilson's attachment; if they meant by that, solely for Gilson's benefit, they were mistaken in point of law. See Wintle v. Freeman, 11 Ad. & Ell., 549; Goldschmidt v. Hamlet, 6 Mann. & Gr., 190.

But in Davidson v. Gorham it was only necessary to plead to

general denial in order to put the plaintiff to the proof of his title. For that suit could turn on no other question than that of title in the plaintiff. And by an examination of that record it will be seen that a general denial was pleaded, and that the decision went on the issue made by that plea. True, the defendant's counsel also justified under the attachment of Gilson. They apparently thought proper to set Gorham's official character on the record, and to do this one attachment was sufficient. The plaintiff in that case did not recover on the ground of any irregularity in the attachments. They never did and never could come in question. If Davidson had failed to make out his title, any attachment, however irregular, (or no attachment at all,) was sufficient to defeat him.

Succeeding on his title, no attachment against Meiggs, however regular, could prevail against him.

But the fact that that suit was defended by Dallas, must conclude him.

The sheriff was, then, necessarily the agent of all the attaching-creditors, and consequently of Dallas, in the retention of the property, and it was against liability arising from this forced agency that Dallas indemnified.

Then as to the measure of damages. We cannot be mistaken in asserting that the consequences of Gorham's act are not to be measured by the benefit which accrued thereby to Dallas. As we have shown before, Gorham could not, nor did he undertake to control or regulate that matter. The measure of damage must necessarily be the injury that accrued to Gorham in consequence of the act.

That was what the obligors undertook specifically to protect him against. Now what was that injury? It was the liability which he might be brought under to Davidson. Where are we to seek for that liability and its extent? In the record of Davidson v. Gorham, where it was established. Dallas and his sureties undertook to bear the burden of that suit, to assume the result, whatever that might be. But will they do so if you allow any other measure to govern than the one established by that record? Nothing can relieve Gorham from that liability but its full payment. Dallas and his sureties did not limit their responsibility to the extent of Dallas' debt, nor to the amount for which the vessel might sell, at a forced and uncompeted sale. Had they proposed to so limit themselves, Gorham would have declined to retain the vessel. They bound themselves to furnish complete protection, commensurate with the injury which Gorham might be made to suffer, without reference to the amount of Dallas' debt, or any other extraneous fact. In other words, they undertook that Gorham should be in no worse condition after that suit of Davidson v. Gorham than he was before. But if the judgment in that suit is not to be the measure of recovery

Davidson v. Dallas.

here, how can Gorham be said to be in as good condition after that suit as before? If you give here less than that record demands, will not Gorham still remain liable to Davidson for the balance; and under those circumstances, can the appellant's bond be said to have been kept? Then what does the record of that suit establish? That Gorham is liable for the sum of eighty-five thousand dollars, with legal interest from January, 1855, making in all, at the time of commencing this suit, a sum exceeding the penalty of this bond.

It is said that the verdict for one hundred thousand dollars is compounded of the injury resulting from the seizure and detention—whilst the obligation of Dallas is to indemnify against liabilities resulting from detention only. By detention is intended the converse of surrendering; the sheriff is to continue to keep, ignoring the claim of Davidson, and treating the property in every respect, as if no such demand had been made, and against the liability that such conduct may involve, he is to be protected. Such conduct involves the detention and sale. Nay, more—it involves the re-seizure, for, although the useless form is never absolutely reduced to practice, the law presumes that the property has been surrendered to the claim, and that upon the indemnifying bond being given, it is re-seized, or, as some of the authorities express it, the inchoate seizure is completed upon the execution of the bond, and this because it is intended to give the sheriff a protection for all the acts done at the request of the attaching-creditor for his benefit. See Wintle v. Freeman, 11 Ad. & Ell., 549; Goldschmidt v. Hamlet, 6 Mann & Gr., 190.

Suppose Gorham had actually paid the judgment in Davidson v. Gorham. When he turns round to recover on this bond, could not the obligors with as much reason plead, that he had not suffered because Davidson may one of these days return him the money. Such a presumption is no more unreasonable than that Davidson may release him. The answer to all this is, that the law does not indulge in presumptions of this character. It presumes that where one incurs a debt or liability, or has a judgment entered against him, he will pay it. And for all the purposes of its operation, it assumes that payment, or its equivalent, follows obligation and liability to pay, as a necessary consequence.

On the whole case, we respectfully submit that the protection which the defendants below promised to Gorham as the consideration and inducement to his performing what they asked of him, will not be afforded, unless the judgment below is in all respects affirmed.

At the July Term, BURNETT, J., after stating the facts, delivered the opinion of the Court.

In this case the defendants submit:

1. That in the Meiggs loan, McPherson acted without authority from Dallas, who never ratified it, and that, therefore, said debt from Meiggs was never, in fact, owing to Dallas; and said suit was, therefore, not authorized under the power.

2. The power of attorney does not authorize the execution of the bond of indemnity for Dallas, and that his sureties, executing the bond as *his* bond, and the condition failing, are not bound.

3. There is no proof of damage within the recitals and condition of the bond, and therefore no breach, nor consequent damage, nor liability proved.

In reference to the first point made by the defendants, it seems that the twenty thousand dollars received by McPherson in the month of August, 1854, was remitted by Dallas for a *specified* purpose only. Dallas held subsequent mortgages upon certain real estate; and one Ricketson held a prior mortgage upon the same property. The object of Dallas was to protect himself by the purchase of this prior mortgage. The money remitted was intended to accomplish a given end, and was specially dedicated to that purpose. So far, then, as the agency of McPherson regarded this particular fund, it was special. Whatever may or may not have been his powers as to other funds, and other matters, his agency here was special. His agency being special, he could not exceed it. " The acts of a special agent do not bind the principal unless strictly within the authority conferred." Rossiter *v.* Rossiter, 8 Wend., 494.

The loan of a part of this money to Meiggs, when it was intended by Dallas for another and a different purpose, was without authority on the part of McPherson, and did not bind Dallas. It was not the debt of Dallas, unless he *afterwards* adopted and made it his by ratification. Dallas had the power to ratify the loan or not, at his pleasure. If he ratifies it, the debt then becomes a debt due from Meiggs to him. But until ratification, as the act was in the beginning without authority, it must be presumed that he would not ratify. So long as the debt remained without ratification it was in contemplation of law a debt due from Meiggs to McPherson. And in order to make a ratification binding, it was held by this Court in the case of Billings *v.* Morrow, January Term, 1857, " that a principal, who ratifies the acts of his agent, must be made acquainted with the character of those acts, and unless all the circumstances are made known to him, the ratification is void."

The acts of an agent beyond his authority, are as the acts of a stranger; and before the principal can be bound he must know what has been done, so that he may advisedly exercise his own judgment upon the circumstances in the same way as if he had originally made the contract himself.

In this case it is clear that Dallas, at the time the bond was executed, could not have ratified this act of McPherson. Dallas

resided in Scotland, and the loans to Meiggs were made September eighteenth, and October third, 1854, and the indemnity bond executed December twenty-third, 1854. The time was so short that it would have been hardly possible to hear from Dallas before the date of the bond. And not only so, but the onus of proving a ratification by Dallas is thrown upon the plaintiff, who, in this case alleges the affirmative of the proposition. There is no proof of any ratification by any act of Dallas done *after* a full knowledge of the circumstances.

It would seem clear that McPherson, under the general power of attorney, received by him October 25, 1854, could not ratify his own unauthorised act. As between himself and his principal he could do no act that would affect Dallas. "A person cannot act as agent in buying for another goods belonging to himself." Story on Agency, § 9.

Another position which seems to be clear and undoubted, is this: that the power of attorney received by McPherson, only authorised him to bring suits upon the *contracts of Dallas*. The debt from Meiggs being the debt of McPherson, he had no right to sue in the name of Dallas. However broad and general we may construe the language of the power to be, it will only embrace matters appertaining to Dallas.

In answer to these views, the learned counsel for the plaintiff insists that "any original want of authority is undoubtedly cured by the record of the suit of Dallas v. Meiggs;" and they maintain that "judicial records for all the purposes for which they can be used, are absolutely conclusive of the facts which they assert."

In the case of Field v. Gibbs and others (1 Peters C. C. R., 157,) Judge Washington says: "The general rule of law, to which I know no exception, is, that nothing can be assigned for error; nor can any averment be admitted which contradicts a record." "A record," says Lord Coke, "imparts in itself such incontrollable credit and verity, that it admits of no averment, plea, or proof, to the contrary, for otherwise there would never be an end of the controversy."

In that case it was held, that in an action upon a judgment against Joel and Martin Gibbs, in which it appears that they defended the former suit by their attorney John P. Ripley, the defendant Martin Gibbs, was not allowed to plead; that the attorney had no authority to appear and plead for him, as the record was conclusive of the fact, whether true or not. So, in the case of Smith v. Bowditch, (7 Pick., 136,) it was held that the signature of the attorney was matter of record, and could not be disputed. And the Court said: "The defendant had no right to look to the record; and if the person whose name is there as attorney, acted without authority, and the plaintiff is thereby injured, the remedy is by an action for damages."

17

So, in the case of the People *v.* Bradt, (7 John., 539,) the same doctrine was laid down.

This is certainly a very stern and rigid rule, sometimes placing parties in the complete power of others, which nothing but the most imperious necessity could justify, and for that reason the rule should not be extended beyond the reasons of necessity and policy upon which it is based. It will be seen, that in the above cases, cited by counsel for plaintiff, the questions all come up between *parties* to the suit. And in his work on Evidence, Professor Greenleaf says : " But to prevent this rule from working injustice, it is held essential that its operation be mutual. Both the litigants must be alike concluded, or the proceedings cannot be set up as conclusive upon either." § 524.

In the case of Dallas *v.* Meiggs, Gorham was not a party, and the record was not conclusive upon him, and cannot be conclusive as between him and Dallas. Conceding, for the sake of the argument, that McPherson had no authority to bring that suit, would the simple fact that he did nevertheless bring it in the name of Dallas, be conclusive upon Gorham as to the question of McPherson's authority ? Suppose Gorham had refused the bond of indemnity, executed by McPherson, upon the ground that the alleged agent had no authority, could Dallas have held Gorham responsible ? Could not the sheriff have shown that the bond was issued without the authority of Dallas, and, therefore, he, as sheriff, was not bound to receive it as the bond of plaintiff in that suit ? It is apprehended that Gorham was not bound to recognize McPherson, as the agent of Dallas, from the simple fact alone that the record showed him to be such. The record could not then be conclusive upon parties and privies, except in some cases for specific purposes.

This view seems to be clearly laid down in Greenleaf on Evidence : " A record," he says, " may be admitted in evidence in favor of a stranger, against one of the parties, as containing a *solemn admission*, or judicial declaration, by such party in regard to a certain fact. But in that case, it is admitted, not as a judgment conclusively establishing the fact, but as the deliberate declaration of the party himself, that the fact was so. It is, therefore, to be treated according to the principles governing admissions, to which class of evidence it properly belongs." § 527 a ; see also § 538.

And the rule upon this subject, is concisely and accurately stated by Lord Chief Justice De Guy, in the Duchess of Kingsston's case, " that the judgment of a Court of concurrent jurisdiction, directly upon the point is, as a plea, a bar, or as evidence, conclusive between the same parties, upon the same matter, directly in question, in another Court."

But conceding the position to be true, that as between Dallas and McPherson, the loan to Meiggs, and the bringing of the

suit, was unauthorized by Dallas, a very important inquiry arises, whether under the circumstances of this case, Dallas had not, by his own acts, placed McPherson in such a position as innocently to mislead Gorham as to the authority of the agent to bring the suit. It was certainly the duty of Gorham to use due diligence in ascertaining the facts, and to know the law. But if, after the use of such diligence, he was still unable to ascertain the facts relative to this *particular* fund, and was misled by reason of the conduct of Dallas, and his agent, then it is apprehended the injury should fall upon Dallas, who committed the error. It is true, that "it is the duty · of persons dealing with an agent, to make inquiries as to the nature and extent of such authority and to examine it." Story on Agency.

What, then, had the sheriff to do? He had to ascertain two facts : 1. That McPherson had power to sue and execute bonds upon the contracts of Dallas : 2. That the suit brought, was upon a contract of Dallas.

Whether the first fact existed or not, could be ascertained by an inspection of the power of attorney. As to the second alleged fact, one of the learned counsel for the defendants insists that its truth could be ascertained by an "inspection of the note sued on, because this was a note payable to McPherson, and by him endorsed to Dallas, which the sheriff was bound to know the former had no right to do."

The truth of this position will depend upon the question, whether the notes, or either of them, as set forth in the complaint, in the case of Dallas v. Meiggs, were, upon their face, in legal effect, the property of McPherson, or of Dallas. As we have seen, one was payable to "McPherson, agent, or order," and the other to "McPherson, agent of A. G. Dallas, or order." It was clear upon the face of the notes, that the consideration for which they were given came from McPherson, in his capacity of agent, and did not move from him in his personal right. In one case it was clear that the consideration came from Dallas. In the other, it was not disclosed from whom the consideration flowed : but the fact that McPherson was but an agent, is seen on the face of the paper. The note payable to "McPherson, agent of A. G. Dallas, or order," upon its face, was the property of Dallas. Sayer v. Nichols, April Term, 1857; Story on Agency, § 160 a. And the question as to whether McPherson had the right to endorse the other note to Dallas, depended upon the two facts, whether the consideration for which the note was given, flowed from Dallas or not, and whether the agent had a right to make the loan to Meiggs. If the money was the money of Dallas, and McPherson, *so far as Gorham had the means of knowing*, had authority to loan it to Meiggs, then McPherson had the right to endorse this note to Dallas. Suppose that McPherson had the right in fact to loan this particular fund, the note would

have been virtually, to say the least, the property of Dallas, and Dallas could not have made McPherson responsible to him for a conversion of the money; provided, McPherson would endorse the note to Dallas. Upon an endorsement of the note by the agent to the principal, the latter would have been in as good a condition as if the note had been taken payable directly to him in the first instance. This endorsement the agent had a right to make, at any time, with or without the consent of the principal, if we concede the authority to make the loan itself. The formal error of McPherson, in making the note payable to him, as agent, without disclosing the name of his principal, he had the right to cure by endorsement.

The question then arises, whether McPherson had the authority, not as between him and Dallas, but as between Dallas and the sheriff, to make the loan to Meiggs.

The testimony of McPherson, as set forth in the record, is the only evidence upon this point. It appears that the indemnity bond was executed at the sheriff's office in the presence of Brady, the clerk and deputy of Gorham. The witness then assured one of the sureties, Falkner, "that Mr. Dallas would protect him." "He, Falkner, put the question frequently, whether it was Mr. Dallas' bond. I told him that I was representing Mr. Dallas, and that he would protect him." It is clear that the representations made to Falkner were made in the presence of the deputy of Gorham. It also appears that Dallas had then a large property in this State, a house in San Francisco, mill property on the Albion Rancho, and mortgages to the amount of from thirty-five to forty thousand dollars. And the witness said, "I considered this as Dallas' debt, when the suit was brought. I had invested other money for Dallas before this."

It is not absolutely certain, from the testimony, as to whether McPherson or others had made these investments for Dallas, but from the facts stated by McPherson, taken in connection with the power of attorney, the conclusion is almost irresistible that McPherson had been the general agent of Dallas in making them.

From all the testimony of McPherson it appears that he had been the general agent of Dallas, in making investments and loans of money, that he received this particular fund for a particular purpose; but, that he could not at the time use it for the purpose intended, and therefore made the loan in question; and that he did not disclose the fact to Gorham, or to his deputy, that he had received this particular fund for the special purpose intended, but that all his representations to the sheriff, as well as to the sureties, went to conceal that fact. Suppose the sureties upon the representations of the agent, and an inspection of the papers in the suit of Dallas v. Meiggs, and the power of attorney, (conceding for the present, that the power

Davidson v. Dallas.

itself was sufficient,) had executed the bond without Dallas, but for his benefit, and suppose they had paid the amount to the sheriff, could not they have their recourse upon Dallas? It would seem clear that they could. Dallas had first employed McPherson, as his agent, to make investments and loans, and then followed this up with a power of attorney, so general and comprehensive in its terms, as not to put others upon inquiry as to his particular instructions in reference to the special fund in question. No one, hearing the representations of McPherson, and knowing his general previous acts, as the agent of Dallas, and looking at the power of attorney, would have thought of inquiring as to this particular transaction. They would only inquire of the agent, "was this Dallas' debt?" That the agent answered in the affirmative, there would seem to be no question. And although there would seem to be no doubt as to the innocent intention of the agent, yet that could not affect the rights of the sheriff, or of the sureties.

If these views be correct, it follows that while, as between the agent and his principal, the loan to Meiggs was unauthorized, yet Dallas is bound by the act of his agent, for the reason that he placed McPherson in such a position as to mislead innocent parties. And from this it seems clear, that as between Dallas and the sheriff, the loan to Meiggs was authorized, and the debt due from Meiggs to Dallas. Story on Agency, § 443; 7 John., 390; 13 Wend., 521.

We will now proceed to consider the second point made by the defendants.

"Formal instruments of this sort are ordinarily subjected to a strict interpretation, and the authority is never extended beyond that, which is given in terms, or which is necessary and proper for carrying the authority so given into full effect." Story on Agency, § 68.

In this case it must also be assumed that as Dallas made the power of attorney to be executed in this State, he did so with a full knowledge of the law as it existed here at the time. Id., § 86.

The learned counsel for the defendants insist that "the power to execute deeds must be confirmed to the last antecedents, to arbitrate, compromise or amicably settle," which construction is assisted by the fact that deeds are technically proper, as matters of law for those purposes, and are *inapplicable in law* to the antecedent powers to sue, collect, and recover." This construction is disputed by the learned counsel for the plaintiff, who insist that the power to execute deeds, applies as well to the power to "sue," as to the power to "arbitrate." In the printed brief of the plaintiff there is a mistake in the punctuation, in putting a semicolon after the words "United States," instead of a comma;

and upon this mistake a portion of their argument is predicated.

It will be seen upon inspection, that there are four clauses in the power of attorney, in each of which separate and distinct specified powers are given : 1, To take possession of property ; 2, To recover debts ; 3, To arbitrate all questions ; 4, To sell real and personal property. These clauses are separated from each other by a semicolon, while the only point used within each clause is a comma.

It would seem, at first view, that it was the aim of the person who drew the power of attorney to separate the subjects of the power into four distinct classes ; to include one class in each separate clause ; and also to specify *within each* clause the *means* intended to be *stated* to carry out the powers conferred in the clause itself. And this view is strengthened by the fact that the word " deed " is mentioned in two different clauses, which would have been unnecessary had the word as used in the third or fourth clause been intended to apply to all the *precedent* powers.

But this view seems to be entirely rebutted by the language of the fourth clause of the power of attorney, which seems not to have been observed by the counsel on either side. The language is this : " and to grant all necessary deeds and acquittances to carry these powers into full effect." The power conferred by the fourth clause is the power to " sell and dispose of said real and personal estate." The power to " sell or dispose of," is substantially the same, and the terms, " *these* powers," must also refer to powers granted in other clauses. This view is confirmed by the use of the word " *acquittances*" in the fourth clause, which could properly have no application to the power to *sell*, but must refer to the power to sue and compromise conferred in the second and third clauses. If the word " acquittances" refers to all the powers previously mentioned, and to which, *in its nature*, it could properly apply, then the word " deeds," connected with it, would equally apply to all the preceding powers, in all cases to which it was necessary as a means to carry them out.

If these views be correct, it was the intention of Dallas to confer upon his attorney the power to execute deeds and other instruments in all the cases previously mentioned, where they were " *necessary to carry these powers into full effect.*" And we think this view so clear that we deem it unnecessary to cite the authorities referred to. We may remark, however, that after a careful examination of them, we do not find them applicable under the view we have taken.

The question then arises, whether the power to execute the bond of indemnity was a " necessary means" of executing the power to sue with " *full effect.*" And to answer this question correctly, we must remember that Dallas intended the power to

be executed within this[1] State, and made it with a view to the law as it then existed. It is substantially conceded by the counsel for the defendants, that "the execution of an attachment-bond would be within the power to sue," upon the ground that it is "an inherent element of the case, which a *principal would contemplate* in every case coming within the requirements of the attachment law."

There would seem to be no doubt as to the correctness of this position. It has been held that the power "to recover and receive a debt will authorize the attorney to arrest the debtor." Story on Agency, § 58.

If, then, the attorney of Dallas had authority to execute an undertaking in an attachment-suit, had he not equal authority to execute an indemnity-bond, under proper circumstances? In this case, the property had been attached, and a third party claimed it. This presented a case in which an indemnity-bond would be proper, under the laws of this State. As to the question whether the property would ultimately turn out to be the property of Davidson, it was the right of the agent to determine, conceding that he had the power to execute such a bond in *any case*. So far as the sheriff was concerned, the suit had been properly brought; and when the property attached was claimed by Davidson, the agent had to determine whether he would at once give up the levy and lose the debt, or whether he would take a trial before a sheriff's jury, or indemnify the officer without such trial. And if he had a right to determine the propriety of indemnifying the sheriff *after* a verdict of the jury in favor of the claimant, he had equally the right to waive that trial, and thereby avoid the risk of the costs necessarily to be incurred. As McPherson had the right to decide as to the *expediency* of issuing an attachment in an attachment case, so he had the same right to determine the expediency of executing the indemnity-bond. The same discretion was reposed in him in reference to both cases, if reposed in him at all.

It must be conceded, that a greater risk is ordinarily incurred in case of indemnity than in the case of attachment. But it must also be conceded that both are equally necessary in proper cases. And whether an indemnity-bond be a necessary means to collect a debt in the particular case—who shall determine, the agent or the sheriff? There are many means usual and necessary to accomplish the same end. Under one set of circumstances, one means may be necessary and another not. An indemnity-bond, under our system, is a necessary means, in a certain state of case. The agent must determine for his principal, and not the sheriff, as to whether it is *expedient* in a case where allowed by law. When the property attached is claimed by a third party, it presents a case proper for indemnity, and in

such a case an indemnity-bond is an ordinary and necessary means under our system of practice.

From these views, it follows that McPherson, so far as the sheriff and sureties are concerned, had authority to execute the indemnity-bond for Dallas.

We proceed now to the third and last point made by the defendants. In considering this point, it must be conceded that the plaintiff can only claim what Gorham could claim had he brought this suit.

In the case of Jones v. Atherton, 7 Taunton, 56, cited by the counsel of plaintiff, it was held that "if a second *fieri facias* be delivered to a sheriff after he has the defendant's goods in possession under the prior *fieri facias* of another, the goods are bound by the second execution, subject to the first execution." And in the case of Goldsmidt v. Hamlet, (6 Manning & Granger, 187,) also cited by them, it was decided, that where A and B, issued separate executions, and both were levied upon the same property at different times, and the prior execution of A was set aside, B was entitled to be paid as if he had been the sole execution creditor. And in the case of Wyntle v. Freeman, (11 Ad. & Ell. 539,) it was settled that when a second execution was levied upon certain goods, and the proceeds were afterwards exhausted by the first execution, the sheriff's return of *nulla bona* upon the second execution was proper.

It would seem that these cases lay down the correct doctrine, and the only question that can arise, is in reference to the application of the principles settled, to the facts of the present case.

It appears that Gorham had first levied the attachment in the case of Gilson v. Meiggs, and afterwards levied the writ in the case of Dallas, upon the same property. He also took a separate bond of indemnity from both Gilson and Dallas, each for the full value of the property attached. As the property could not be divided, he was compelled to seize and detain it entire, under both attachments. The seizure under Gilson's attachment being prior in point of time, was absolute, and that under Dallas' attachment, being subsequent, was *subject to the first*. As the sheriff could not foresee whose levy would ultimately prevail, it was his right and his duty to take full indemnity from each, so that he would be secure in any event.

As between Davidson and the sheriff, it was a matter of indifference to the former, under what authority the "Underwriter" was taken. It was not the business of Davidson to inquire. But as between the sheriff and those for whom he acted, the question assumes a very different shape. As between him and them it was a matter of contract. In making these contracts each party must be held to have known the law; and the terms of the law therefore enter into and form a part of them without

Davidson *v.* Dallas.

any express stipulation to that effect.   The parties must also be held to have contracted with a knowledge of the facts so far as they were shown by the proceedings.

In detaining the vessel under each attachment, the sheriff acted as the agent of both Gilson and Dallas; but his agency for Gilson was *primary*, while it was *secondary* for Dallas.   It was conditional as to both.   If the sheriff ultimately incurred no liability, he could recover nothing.   And if he did incur liability, must he not recover in the order in which he levied?   And of each plaintiff, in proportion to the liability ultimately incurred *for him?* The ultimate liability of the indemnitors was not fixed by the execution of the bonds, but depended upon subsequent events; and as both the fact of liability at all, and also its amount, were dependent upon subsequent events, why should not the fact, as to which plaintiff should be liable, and in what proportion, and in what order, be equally dependent upon the result of the proceedings in the two attachment-suits?   If the sheriff did his duty in taking full indemnity from each creditor, (and if he did not, it was his own error,) then he was protected in any event.   If the attachment of Gilson was defeated, and that of Dallas sustained, then Dallas would be held as the *sole* attaching-creditor, under the authority of one of the cases before cited, and be subject to the ultimate sole liability.

It is true, Gorham detained the whole vessel for Dallas, but he detained it subject to the prior attachment of Gilson.   The vessel could not be divided, and the detention of the sheriff for each creditor was in the order mentioned, and the liability to him for this detention must be in the same order.   If this order be subject to be changed or disturbed by the result of the suits, then the order of liability is equally subject to the same contingency. And so in reference to the proportion of damages for which each party may become liable.

It is conceded, that in a case of *joint* trespass, the *party injured* may sue one or all of the trespassers, and each one will be liable for the whole damages, but a satisfaction made by any one of them, will be a discharge of all.   But in this case, as between the sheriff and his indemnitors, the same rule cannot apply.   He does not bear towards them the same relation that the injured party does towards joint trespassers.   As between Gorham and the attaching creditors, their liability to him arises under contracts allowed by law.   In these contracts, there were mutual covenants.   He bound himself to detain the property, *first*, for Gilson, and second, for Dallas, with the condition that this order was subject to be changed by the ultimate result of the suits.

From the principles of the cases referred to, and the provisions of our Practice Act, these conclusions would seem to follow:

1. If the attachments were ultimately sustained, and the whole proceeds of the property absorbed by the debt of Gilson, then

he would have been solely responsible to the sheriff for the en-
tire liability incurred by him to Davidson.

2. If the levy of Gilson had been defeated, and that of Dallas
sustained, then Dallas would have been solely responsible for the
entire amount.

3. If both attachments had been sustained, and the property
sold for more than sufficient to pay Gilson, then Gilson and
Dallas would have been responsible in proportion to the amounts
paid to each by the sheriff.

4. If both the attachments had been defeated by Meiggs, or if
the suits of Gorham against the indemnitors had been com-
menced before the determination of the attachment-suits against
Meiggs, then the separate responsibility of Gilson and Dallas,
would have been in proportion to the amounts of their respect-
ive attachments, except in case the whole amount for which both
attachments were levied, had exceeded the value of the property
as settled in the suit against the sheriff, in which case the prior
attaching-creditor would have been responsible to the amount of
his attachment, and the subsequent attaching-creditor for the
remainder.  For example, if the first creditor attach for ten
thousand dollars, the second, for twenty thousand, and the value
of the property be twenty thousand, they would each be respon-
sible to the sheriff for ten thousand dollars.   Upon the rendition
of the judgment against the sheriff, the title of the property
vests in him for the several indemnitors, who have each an inter-
est in proportion to their respective liability to the sheriff.   As
the attaching-creditors had obtained no judgment against the
debtor at the time, they should each relinquish his levy upon
the property.   The debtor has no right to ask that the property
should be sold, and the proceeds appropriated to his debt.   The
property never having been his, he has no right to the proceeds.

In opposition to this view of the case, it is insisted that,
" A Court of Law cannot apportion the amount of recovery be-
tween Gilson and Dallas."   But this objection does not seem
to be well founded.   That the sheriff is entitled to full indem-
nity is conceded; but what proportion he shall recover from
one, and what from the other, is a matter that affects the *quan-
tum* of damages in each case only.   It is conceded, by the coun-
sel for plaintiff, that a satisfaction of the bond of Gilson would
discharge Dallas.   In other words, Gorham could not collect the
full amount from each party.   If a full payment by Gilson would
discharge Dallas, then a partial payment by Gilson would be
*pro tanto* a discharge of Dallas.   And if partial payments made by
Gilson could be proven by Dallas, to lessen his responsibility, it is
not perceived why he could not be permitted to show either the
entire or partial separate responsibility of Gilson to Gorham, in or-
der to produce the same result.   It would seem to be as easy for a
Court of Law to ascertain the proportionate liability of each in-

demnitor, as to ascertain the partial payments made by each. The criterion which settles the proportionate responsibility of Gilson and Dallas is found in the records of the two cases, and the practical application of it, is a matter of calculation readily made.

The theory of the plaintiff, in subtance, is this: Gorham had a right to demand a separate indemnity from Gilson and Dallas, for the full value of the property; and, in the event of his becoming liable to Davidson, he could sue either of them, at his election, and recover from the party sued the entire amount of his liability to Davidson, if within the penalty of the bond, and this without any regard to the rights of Gilson and Dallas, as between themselves. But this theory would seem to be incorrect, and to lead to very unjust results. The legal effect of a judgment for the full value of property converted by a party, operates as a change of the title, which at once vests in the defendant. 2 Tucker's Com., 90; Starkie, 1281, 1507.

As Gorham took the property for Gilson and Dallas, the property vested in him for their benefit. The law gave Gorham the property for the judgment, and if he relied upon the indemnity-bonds, in the place of the property, he should look to the party who received the proceeds. As Gorham first took the property for Gilson, and afterwards disposed of it for him, he should look to Gilson, and not to Dallas. He was the separate agent for both parties, but in the *order stated;* and, as he disposed of the property for one only, he should look to him alone. And it is no answer to this view, that the disposition of the property made by Gorham was not voluntary on his part, but was compelled by the law. The law afforded him ample protection. If he did his duty, he had full indemnity from *each party*, and any disposition the law might make of the property would not, in the contemplation of the view we have taken, materially injure him. His remedy, upon the bond of the proper party, was ample. It mattered not to him which party was made liable. His rights were equally protected in either case, because he had taken good bonds in both. If not, it was his own error.

If we take the theory of the plaintiff to be correct, for the sake of the argument, it would certainly place a subsequent attachment or execution-creditor in a very perilous condition. We will take the facts of this case as an illustration. The debt of Dallas was twelve thousand five hundred and forty-two dollars, and Gilson's of thirty-five thousand dollars. The property was claimed by Davidson, and could not be divided. Dallas was compelled to indemnify, or give up the lien of his attachment. If he indemnified, he incurred a risk to the amount of one hundred thousand dollars, for the chances of making twelve thousand five hundred and forty-two dollars. As Gorham had the

right to sue either Gilson or Dallas for the entire amount, Dallas was at the caprice of the sheriff, whose motive for suing him in preference to Gilson, he could not inquire into. Under such a theory, would any prudent subsequent creditor ever think of giving an indemnity-bond?

This brings us to consider the effect of the agreement between Gilson and Dallas. In that agreement, it was stipulated in substance, that if the decision should be that the vessel was the property of Meiggs, and it should not sell for a sufficient amount to satisfy both demands, that then the proceeds should be divided in proportion to the debts. But in case the decision was adverse to them, then they were to pay the necessary expenses in the same proportion. There is nothing in the agreement that gives any part of the proceeds of the vessel to Dallas, in the event that it was decided to be the property of Davidson. In reference to that matter the agreement is silent, and leaves the parties to rest upon their legal rights, as if no agreement had been made. The event contemplated by them, and to which the agreement refers, did not happen.

This view disposes of the case without the necessity of· deciding several other points mentioned in the briefs of counsel.

The judgment of the Court below should be reversed, a new trial ordered, and the cause remanded for further proceedings.

MURRAY, C. J.—I concur in the judgment.

A re-hearing having been prayed for at this term, BURNETT, J., delivered the opinion of the Court—TERRY, C. J., concurring.

This case was decided at the present term, and a petition filed by plaintiff for a re-hearing. The importance of the case renders it proper that some additional reasons should be given.

The learned counsel for the plaintiff, in their petition for a re-hearing, have referred us to the case of Watmaugh *v.* Francis, 7 Penn. R., 206, as an authority against the position we have taken. The facts of that case were substantially and concisely these: Baldwin had a *prior* and Francis a *subsequent* execution against Norris. Both executions were levied upon certain property, which was claimed by Thompson. Baldwin did not indemnify the sheriff, but Francis did. The sheriff proceeded and sold the property under both executions, and paid over the entire proceeds to Baldwin. Thompson sued the sheriff and obtained judgment against him, for the value of the property, and then the sheriff sued Francis upon his bond, and it was held by the Supreme Court of Pennsylvania, that the sheriff could recover.

The statutes of that State contain a provision regarding indemnity-bonds given to sheriffs. Laws of Pennsylvania, from 1700 to 1849, by Dunlap. But, according to the practice in that State, when property attached, or levied upon, by an officer, is

Davidson v. Dallas.

claimed by a third party, the Court, upon application, will enlarge the time for making the return. In the opinion of the Court, Rogers, J., holds this language:

"As he is bound to execute the writ at his peril, where there is reasonable doubt whether the goods are liable to be taken on the *fi. fa.*, he may apply to the Court from which the writ issues, and in a proper case, the Court will enlarge the time for making the return to the writ *until the right be tried,* or *a sufficient indemnity be given.* But when he has received, or tendered an indemnity, it is his duty to proceed, on the pain of being attached or fixed for the debt."

From this, it seems clear, that where indemnity is offered the officer must proceed, but when it is not offered, he cannot relinquish the levy except at his peril, but *may* apply to the Court to enlarge the time for making the return, "*until the right be tried, or until sufficient indemnity be given.*"

In reference to another point, the same learned Judge proceeds to say:

"Under the circumstances in which he was placed, what was the sheriff to do? On the tender of indemnity, he was bound to execute the writ; so say all the authorities. It is also clear, that the Court will not stay the proceedings on the allegation, simply, that he has another execution in his hands against which he is not indemnified. The answer to such an allegation would be, that is nothing to you—you have a sufficient bond of indemnity, and it matters not by whom it is given, whether by the first or second execution-creditor. You are not entitled to two indemnities. You cannot execute one writ without executing the other; the levy and sale on one, is the levy and sale on both."

It will be seen upon a careful examination of the able opinion of Mr. Justice Rogers, that the decision was mainly predicated upon the grounds indicated in the extracts given. As the sheriff could not relinquish the levy, except at his peril, there was no *necessity* for Francis to indemnify. If Francis, as well as Baldwin, had refused to indemnify the sheriff, then the latter would have applied to the Court, and then the right to the property would have been tried, and the same question finally settled, that was afterwards settled in the case of Thompson against the sheriff. Under such a practice, no risk was necessary on the part of either execution-creditor. But as Francis chose voluntarily to incur the risk, when unnecessary, he was held to incur it for the other execution, as well as for his own; and the sheriff was only allowed to take *one* indemnity; and as he was allowed to take but *one* bond, he was allowed to recover on that. And the whole theory of that opinion substantially rests upon these grounds:

1. That the creditors were not bound to incur any risk.

2. That if they did so voluntarily, the sheriff could take but *one* bond of indemnity.

3. That if the bond was given, the sheriff must proceed upon *all* the executions.

But the provisions of the one hundred and thirty-first and two hundred and eighteenth sections of our Practice Act, have most materially changed the rule upon this subject. Under our system, if the property be claimed by a third person, the sheriff may protect himself by a trial before a jury of six; and if the verdict be in favor of the claimant, the sheriff may relinquish the levy unless indemnified. Here the creditor is either compelled to abide the verdict of a sheriff's jury, or he must give the indemnity. He cannot, as in Pennsylvania, have a regular and final trial before a competent Court, without risk, but he must either submit to the decision of six men, unaided by the instructions of a competent Court, or lose his debt. And the hardship of the creditor would be increased beyond endurance, if we hold that the sheriff could take but *one* indemnity bond, and that such indemnity, when given, either by the prior or subsequent creditor, would enure to the benefit of all the writs that might come into the hands of the officer, and be levied upon the same property. For, as I understand the principle settled in that case, if Baldwin had given the indemnity instead of Francis, then the sheriff would have been still competent to proceed under *both* executions; and if the proceeds had been more than sufficient to satisfy Baldwin's execution, then the surplus would have been applied to the execution of Francis. And if there had been several other subsequent executions, and the property had brought enough to have satisfied them, in whole or in part, the result would have been the same. The indemnifying creditor, whether *first, intermediate, or last,* took all the responsibility, and all the others shared the benefit of his indemnity in the order of the priority of their several executions.

But it cannot be so under our statute. If Gilson had refused to indemnify, and Dallas had done so, then the sheriff should have released the levy of Gilson, and Dallas would have shared all the responsibility and all the benefit.

And the same rule would apply to any subsequent creditor who refused to indemnify. The object of the statute is to make responsibility and benefit go together. And this being true, it is apprehended that there can be no other theory but the one we have adopted, that will legitimately carry out this intent of the statute, and do equal and exact justice to all parties.

It is only upon the ground that our statute makes responsibility and benefit go together, that Gorham had the right to take separate bonds, (each for the full value of the property,) both from Gilson and Dallas. If the protection of the sheriff had been the *sole* object, without regard to the rights of each

creditors, as between themselves, then only *one* bond could have been taken.

The protection of the sheriff would have been amply secured by one, and there could have been no necessity for more. But as each creditor was compelled to indemnify, or relinquish his levy, the sheriff had the right to take separate bonds from each. And the object of these separate bonds was to protect the rights of the indemnitors, as between themselves. And while it was the object of the statute to give the sheriff protection, it was also its object to give creditors a fair opportunity to assert their rights, without placing them in such a position as to force them, either to lose their debts, or to incur extraordinary risks, entirely disproportionate to the necessities of the case.

If the theory we have adopted be fairly carried out, and practically applied, it will be found to afford the sheriff ample protection, and yet, at the same time, not do injustice to creditors. It will not place the creditor in such a position that he must choose between two severe alternatives.

It is impossible, within the limits of an opinion, to anticipate and answer all the objections and misconceptions of counsel. But I apprehend that, upon a careful examination of the former opinion in this case, it will be found perfectly consistent with itself, and that no such consequences legitimately flow from it, as has been supposed by counsel. The four cases mentioned are all based upon the same principle, and are entirely consistent with each other. The principles laid down in these four points, it is conceived, will include every case that can arise. The language of the fourth point, may be made more full, by saying " defeated or dismissed," in place of " defeated by Meiggs."

In the opinion, we said that " in detaining the vessel under each attachment, the sheriff acted as the agent of both Gilson and Dallas, but his agency for Glison was *primary*, while it was *secondary* for Dallas. It was conditional as to both."

What was meant by the expressions *primary* and *secondary*, would seem to be sufficiently explained in the opinion itself.

As to the sentence, " it was conditional as to both." Where an officer attaches the property of the *defendant*, he does not act as the agent of the plaintiff, but as the officer of the law. But when he attaches property that does not belong to the defendant, he goes beyond the command of the writ, and acts as the agent of the party at whose instance he does the act. As it was unknown whether the Underwriter was the property of Meiggs, or not, the sheriff's agency at that time was but conditional, and depended upon the result of subsequent proceedings. If it turned out to be the property of Davidson, then the sheriff acted as the agent of Gilson and Dallas; if otherwise, he detained the property as the officer of the law.

After the most careful consideration of the subject, I can see no sufficient reason·for changing the former opinion.

Petition denied.